# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| MELODY L. WARD, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 04-5100-CV-SW-GAF-SSA |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER

This case involves an application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, *et seq*, filed on August 30, 2001. Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Plaintiff's application was denied initially and on reconsideration. On December 4, 2003, following a hearing, an administrative law judge (ALJ) rendered a decision finding that plaintiff was not under a "disability" as defined in the Act at any time through the date of the decision. On August 16, 2004, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion.

*See Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence in the record supports the Commissioner's decision, the court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because the court would have decided the case differently. *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001). If, after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations omitted).[1]

Plaintiff argues that the ALJ erred at step-three of the sequential evaluation process by not naming a specific listing when he found that she did not have an impairment or combination of impairments which met or equaled a listed impairment. "Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion. . .". *Pepper o/b/o Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (citations omitted). The record as well as the decision of the ALJ supports his determination that plaintiff did not meet or equal any listed impairment.

Contrary to plaintiff's contention, there is evidence of record to support a determination that plaintiff's condition does not meet or equal the Commissioner's musculoskeletal listing at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B (2004) (Listing 1.02B). As the Supreme Court has stated, the severity standards for listed impairments are high:

---

[1] Upon review of the record and applicable authority herein, the defendant's position is found to be controlling. Much of defendant's brief is adopted without quotation noted.

2

> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The Listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." *See* 20 C.F.R. § 416.925(a) (1989) (purpose of listings is to describe impairments "severe enough to prevent a person from doing any gainful activity"). . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. . .

*Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). "For a claimant to show that her impairment matches a listed impairment, she must show that she meets all of the specified medical criteria." *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004) (citation omitted). To medically equal a listed impairment, the medical findings must at least equal in severity and duration the listed impairment. *See* 20 C.F.R. § 404.1526(a) (2004).

Listing 1.02B has a number of requirements, at least several of which plaintiff's condition fails to satisfy: it requires a major dysfunction of a joint or joints characterized by "gross anatomical deformity" (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability); *and* chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint or joints; *and* findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint or joints; *and* [the B criteria] involvement of one major peripheral joint in each upper extremity (*i.e.,* shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2b. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02B (2004).

The ALJ found that plaintiff has disorders of the cervical spine and lumbar spine and a possible torn rotator cuff in her right shoulder. However, there is evidence of record that the severity of those

impairments does not indicate that plaintiff has a "gross anatomical deformity (*e.g.,* subluxation, contracture, bony or fibrous ankylosis, instability)" effecting both upper extremities as required by Listing 1.02B.  In February 2002, Dr. Pak found plaintiff to have no atrophy of the upper [or lower] extremities, and good strength, although guarded with resisted shoulder motions. While plaintiff reported tenderness in the right interscapular area, Dr. Pak detected no impingement signs and no pain in the subacromial area.  Dr. Pak also found that plaintiff had grade 2 deep tendon reflexes in the biceps, triceps, and brachioradialis.  Also, in February 2002, Dr. Lin found that, despite probably right C5-6 radiculopathy, chronic cervical muscular strain, and soft tissue injury of the right shoulder girdle, there were no focal neurologic deficits, and plaintiff was not impaired in the ability to sit, stand, walk, or travel.  In June 2002, Dr. Weber found plaintiff's cervical posture to be "fairly good," although with some trigger point tenderness in the neck and scapular area.  While plaintiff reported some pain with rotation and lateral bending, particularly on the right, her right shoulder range of motion was "fairly good" without obvious pain on impingement or supraspinatus tenderness."  Motor strength testing was within normal limits with normal sensation to light touch, and deep tendon reflexes were 3+ and symmetric at the biceps, brachioradialis, and triceps.  Among his impressions, Dr. Weber noted a "history" of right rotator cuff tear, and that plaintiff's C5-6 radiculopathy [as well as her L5-S1 disc degeneration] had improved.  Similarly, in January 2003, Dr. Harbach found plaintiff to have a full range of motion of both upper extremities.  She could also reach overhead with her hands and behind her back without much difficulty.  The record supports a determination that plaintiff does not have a "gross anatomical deformity" affecting both upper extremities as required by Listing 1.02B.

Plaintiff also fails to meet the B criteria of Listing 1.02, *i.e.*, involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2b. Plaintiff has been diagnosed with a possible rotator cuff tear in her right shoulder. However, the record supports the ALJ's finding that plaintiff was "unable to perform overhead work with the right arm, but her ability to reach with the left arm is not limited,) and that she had "no limitation of the ability to perform fingering, feeling, or handling."

Plaintiff points to evidence from Drs. Hunter and Woodall as proof she is unable to do "any kind of reaching." This evidence consists of a one page "employee health report" completed by a Dr. Hunter on August 30, 2001, which includes check marks indicating "restricted reaching" above chest, overhead, or away from body. Notably, this report contains no diagnoses or clinical findings to support it. The ALJ was entitled to reject Dr. Hunter's opinion, noting that there was no evidence that Dr. Hunter ever treated the claimant and because his opinion was unsupported by the evidence of record.

The evidence from Dr. Woodall is also a one page "employee health report," completed by Dr. Woodall on November 28, 2001, which indicates that plaintiff was to engage in no reaching above chest, overhead, or away from body. This report also contains no diagnoses or clinical findings to support it. The evidence is also a form completed by Dr. Woodall on August 6, 2003, which indicates with a check mark that plaintiff had "significant limitations with reaching, handling or fingering." Again, no diagnosis or clinical findings are offered to support the restrictions listed.

Plaintiff also points to evidence from Dr. Lin as evidence she could not lift, carry, and handle objects in a sustained manner. Dr. Lin actually stated: "In my opinion, I feel she is able to do light

5

lifting, carrying, handling objects but not in a sustained manner *because of her subjective complaints*".
As will be discussed *infra*, the ALJ found plaintiff's subjective complaints "not fully credible."

Furthermore, there is evidence of record of plaintiff's daily activities which reflects that any limitation plaintiff may have performing fine and gross movements does not meet the degree necessary to satisfy Listing 1.02B. The regulation at 1.00B2b explains that inability to perform fine and gross movements effectively "means an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b (2004). The regulation goes on to provide examples of inability to perform fine and gross movements effectively, such as "the inability to prepare a simple meal and feed oneself." *Id*. In this respect, plaintiff reported that she cooked one meal a day [the evening meal], did a number of other household chores, including doing laundry and cleaning up the bathroom and kitchen. Plaintiff reported that the only household chore she required help with was vacuuming. The regulation also lists as an example of inability to perform fine and gross movements effectively "the inability to take care of personal hygiene." *Id*. Plaintiff, however, reported that she was able to take care of all of her personal needs."

Plaintiff also argues that the ALJ erred in rejecting the opinion of Dr. Woodall. Dr. Woodall opined that plaintiff had limitations that would significantly impede work activity, including the inability to lift any amount of weight, limitations with reaching, handling, or fingering; an inability to maintain attention and concentration due to pain; and the need to be absent from work for more than four days a month. The ALJ rejected Dr. Woodall's opinion as "not supported by the doctor's treatment notes or any other evidence of record." A treating physician's "conclusory statement – that is, a statement not

6

supported by medical diagnoses based on objective evidence – will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). The conclusions of any medical expert may be rejected "if inconsistent with the medical record as a whole." *Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) (quoting *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995)).

While plaintiff points to references to cervical and back pain in Dr. Woodall's office notes, these appear to be based largely on her subjective complaints. Dr. Woodall does occasionally refer to medical evidence from other sources, however, his own office treatment notes contain little in the way of physical examination results, and contain no clinical findings to support the limitations he suggested on the functional capacity questionnaire he completed for plaintiff's attorney. Furthermore, Dr. Woodall's actual treatment notes mention none of those limitations. *See Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citation omitted) (ALJ properly rejected treating physician's opinion due to internal inconsistencies and because it was "outweighed by the other record evidence); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citation omitted) (ALJ properly rejected treating physician's opinion of limitations where "[n]one of these restrictions appear elsewhere in [the physician's] treatment records").

By way of example, Dr. Woodall's treatment notes from November 17, 2001, included the observation that plaintiff's extremities were "grossly unremarkable," and that "no real back tenderness is noted at this time." The physical examination portion of Dr. Woodall's treatment notes on November 28, 2001, December 5, 2001, and December 13, 2001, consisted only of recordings of plaintiff's vital signs. On April 18, 2002, Dr. Woodall noted that plaintiff was being treated for back pain by Dr. Pak, although she had no follow up scheduled with the physician. Dr. Woodall's own examination results on that occasion contained only plaintiff's vital signs and a remark that she had a 3 cm lipoma [a benign

7

tumor] at about L-2 on the right side of her back that she wanted excised. On May 24, 2004, Dr. Woodall's examination results included an observation of tenderness at L5-S1, although there was "no radiculopathy associated with this." On July 15, 2002, Dr. Woodall's examination results consisted of plaintiff's vital signs and an observation that she had poison ivy; and the remark that she had "no other physical symptoms or complaints."

Dr. Woodall's opinion is also not supported by other evidence of record, including a significant amount of clinical evidence from physicians who conducted far more thorough physical examinations. For example, on February 12, 2002, Dr. Pak observed that plaintiff had no atrophy of the upper or lower extremities, and good strength, although she guards with resisted shoulder motions. He detected no impingement signs and no pain in the subacromial area, and noted that deep tendon reflexes were grade 2 in the biceps, triceps, brachioradialis, knees, and ankles bilaterally. Dr. Pak declined to prescribe further trigger point injections or a continuation of narcotic medication unless plaintiff participated in a rehabilitation program.

On February 19, 2002, neurologist Dr. Lin examined plaintiff. Based on his review of x-ray, EMG and MRI results, as well as his own physical examination, Dr. Lin opined that plaintiff probably had a right C5-6 radiculopathy as well as chronic cervical muscular strain and soft tissue injury of the right shoulder girdle. Despite these conditions, Dr. Lin found no focal neurologic deficit, and opined that plaintiff had no impairment of the ability to sit, stand, walk, hear, speak, or travel. He additionally opined that plaintiff was able to do light lifting, carrying, and handling of objects, but, because of her subjective complaints, not in a sustained manner.

8

On June 10, 2002, Dr. Weber's examination of plaintiff found her cervical posture to be "fairly good" with some trigger point tenderness in the neck and scapular areas. Plaintiff reported some pain with rotation and lateral bending, particularly on the right, although range of motion was good for both flexion and extension. Dr. Weber noted that loading and distraction were unremarkable, as was Spurling maneuver. Shoulder range of motion was "fairly good" on the right "without obvious pain on impingement or supraspinatus tenderness." Motor strength testing was within normal limits with normal sensation to light touch. Deep tendon reflexes were 3+ and symmetric at the biceps, brachioradialis, and triceps. Examination of plaintiff's back revealed normal curvature and no significant scoliosis. Her stance was only "mildly" asymmetric and palpation of the low back was unremarkable. Plaintiff reported some tenderness in the right gluteal area, although the sacroiliac joint was not tender to palpation. Internal rotation, external rotation, and straight leg raising at the hips was unremarkable. There were no obvious dural tension signs, and no Hoffman or Babinski signs. Plaintiff's gait was unremarkable including heel/toe walk. Dr. Weber concluded that plaintiff 's cervical and lumbar disc problems had improved, and that "her current symptomatology does not coincide with those pains." Noting plaintiff's abuse of marijuana and "lack of documentation suggesting that she is appropriate for narcotic management," Dr. Weber declined to prescribe narcotic analgesics unless plaintiff was abstinent from all substances for over one month. Dr. Weber eventually prescribed narcotic medication, but discontinued it and suggested she find pain treatment elsewhere when he learned that plaintiff was doubling the dosage he prescribed.

On January 10, 2003, an orthopaedist, Dr. Harbach, examined plaintiff and found her to be well-developed, well-nourished, and in no acute distress. She had a normal gait and normal tandem

gait. She could walk on her toes and heels without difficulty and could forward flex chin to chest. She could extend approximately 30 degrees and laterally bend. She rotated with some stiffness, but was able to perform full rotation. She had full range of motion of both upper extremities. She could go overhead with her hands and behind her back without much difficulty. Her reflexes were 2+ and symmetric about the triceps, biceps, and brachial radialis. While plaintiff described soreness about the right shoulder, her muscle strength was 5/5 and symmetric bilaterally. Spurling sign and Hoffman test were negative, and plaintiff had normal sensation down both upper extremities. Plaintiff was tender to palpation primarily over the superior border of the right scapula, described as trigger point type pain, although it did not recreate pain down the arm. There was no edema or muscle atrophy. Plaintiff described right hip pain, but on examination was "completely normal." She was nontender to palpation about the greater trochanteric region, and only "mildly" tender about the paraspinous musculature of the low back. She had normal sensation down both legs and was neurovascularly intact. Reflexes were 2+ and symmetric about the knees and ankles.

On January 15, 2003, and MRI ordered by Dr. Harbach was "essentially unremarkable," with "no evidence of central or foraminal stenosis or herniated disc." On January 21, 2003, Dr. Harbach administered a trigger point injection in the gluteus muscles, which he noted produced good initial relief. Dr. Harbach did not think plaintiff needed surgery. He noted: "She keeps asking questions about disability and if she qualifies. *She has all subjective complaints and no objective findings."* Substantial evidence supports the ALJ's rejection of Dr. Woodall's opinion as unsupported by his own treatment notes and the evidence on the record as a whole.

Plaintiff argues that the ALJ's hypothetical question to the vocational expert was "inadequate" because it did not mention all of her alleged limitations. In particular, plaintiff argues that the hypothetical should have included the limitations suggested on the functional capacities questionnaire Dr. Woodall completed for her attorney. Plaintiff's argument is without merit because, as discussed *supra*, the ALJ properly rejected the limitations suggested by Dr. Woodall. "A hypothetical question . . . need only include impairments that are supported by the record and which the ALJ accepts as valid." *McKinney v. Apfel*, 228 F.3d 860, 865 (8th Cir. 2000) (citation omitted). Plaintiff also suggests that the ALJ's hypothetical should have included Dr. Lin's suggestion that she was unable to lift, carry, or handle objects in a sustained fashion. Dr. Lin's opinion more fully stated that he found no neurologic deficit in his examination, that he believed plaintiff had no impairment of sitting, standing, walking, hearing, speaking, and traveling; and that she was "able to do light lifting, carrying, handling objects but not in a sustained manner *because of her subjective complaints.*" As will be discussed *infra* on plaintiff's next argument, the record supports the ALJ's finding that plaintiff's subjective complaints were "not fully credible." "Discredited complaints of pain . . . are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them." *Guilliams*, 393 F.3d at 804 (8th Cir. 2005) (citing *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004)).

Plaintiff argues finally that the ALJ erred in evaluating her credibility. In evaluating plaintiff's subjective complaints and ultimately determining credibility, the ALJ must consider the medical evidence and medical opinion evidence, as well as non-medical and subjective factors, in compliance with the Commissioner's regulations at 20 C.F.R. § 404.1529(c), Social Security Ruling (SSR) 96-7p, and the factors for evaluating subjective complaints set forth in *Polaski v. Heckler*, 751 F.2d 943 (8th

11

Cir. 1984). The issue is not whether the claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that they prevent her from performing substantial gainful activity. *See Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir. 1998).

With respect to plaintiff's argument that the ALJ erred by not discussing each and every credibility factor, "[t]he ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered." *Tucker*, 363 F.3d at 783. The ALJ did this.

The record reflects the ALJ considered the objective medical and medical opinion evidence and found that it does not support the extreme symptoms and limitations claimed by plaintiff and espoused by Dr. Woodall. Among the more recent evidence, from January 2003, there is an MRI that was "essentially unremarkable," with "no evidence of central of foraminal stenosis or herniated disc," as well as an examination by an orthopaedic specialist, Dr. Harbach, who found that plaintiff could reach overhead with her hands and behind her back "without much difficulty," and that she had full range of motion of both upper extremities. Dr. Harbach concluded: "[s]he has all subjective complaints and no objective findings." The absence of objective medical evidence which supports the degree of severity alleged by a claimant is an important factor to be considered by the ALJ. *See Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (citation omitted).

In addition to the medical evidence, the ALJ considered subjective factors in assessing plaintiff's credibility, including evidence that plaintiff "repeatedly declined physical rehabilitation and psychological treatment and has instead focused on attempting to obtain narcotic pain medication against medical advice." "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." *Guilliams*, 393 F.3d at 802 (8th Cir. 2005) (citation omitted); *Lewis v.*

12

*Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003) (plaintiff's "own actions" in failing to follow doctors' advice to participate in exercise and quit smoking "discredit her disability allegations").

Substantial evidence supports the ALJ's observation. In February 2002, Dr. Pak declined to prescribe further trigger point injections or a continuation of narcotic medication unless plaintiff began a physical rehabilitation program. In June 2002, Dr. Weber noted that plaintiff did not wish to follow Dr. Pak's advice, but rather was "more interested in narcotic management of her pain." Dr. Weber expressed concern about prescribing narcotics in view of plaintiff's abuse of marijuana and "lack of documentation suggesting that she is appropriate for narcotic management." Dr. Weber eventually prescribed the narcotic pain medication OxyContin, but stopped in November 2002 when he learned that plaintiff was violating the "pain management contract" by taking double the prescribed dose. Dr. Weber declined to continue plaintiff's pain management unless plaintiff agreed to see a psychologist on a routine basis, a proposition she declined, citing lack of finances. In response, Dr. Weber suggested plaintiff find a different pain management specialist "for her narcotic needs." In January 2003, Dr. Harbach referred plaintiff for physical therapy, although there is no evidence that she obtained that therapy through at least May 30, 2003, at which time Dr. Lampert stated further treatment would be "contingent upon her seeing our physical therapist and psychologist for consultation."

The ALJ also considered plaintiff's daily activities, as well as inconsistencies between her hearing testimony on that topic and a written account of daily activities she provided. For example, plaintiff testified that she spent most of the day laying down, and did not do any housecleaning, laundry, meal preparation, dishwashing, or shopping, chores she claimed were all done by her husband. By contrast, on a questionnaire plaintiff completed pursuant to her disability application, she indicated a

13

much higher level of activities, albeit with some limitations. She reported that on a typical day she rested, looked after her daughter's needs, did one load of laundry, cooked one meal [the evening meal], cleaned up the bathroom and kitchen, and played with her daughter. She did household chores "slow and easy," trying not to stoop or bend because that caused pain. The only household chore she required help with, however, was vacuuming. She drove a car. On Fridays and Saturdays she drove for "child exchange." She also went grocery shopping once a week, although it took longer than it used to because she had to go slower to save strain on her neck and arms. She was able to take care of all her own needs, although "at a cost in pain." She read the Bible and real estate magazines, watched television, and watched movies with her daughter. For hobbies she painted, in a standing posture and for 15 minutes or so at a time, and played the piano, one or two songs, three times a week. The ALJ appropriately found that these activities were inconsistent with plaintiff's allegation of total disability. *See Guilliams*, 393 F.3d at 802 ("significant" daily activities such as cooking and laundry were inconsistent with claim of disabling pain); *Barnett v. Barnhart*, 362 F.3d 1020, 1023 (8th Cir. 2004) (doing laundry, washing dishes, vacuuming, grocery shopping, paying bills, walking for exercise, and attending church were activities consistent with plaintiff's ability to perform past relevant work); *Hutton v. Apfel*, 175 F.3d 651, 654-55 (8th Cir. 1999) (making breakfast, washing dishes and clothes, visiting friends, watching television, and driving were inconsistent with claim of total disability).

The ALJ also considered that plaintiff "had a solid earnings history," although he found that based on the other factors considered, plaintiff's allegation of disability was "not persuasive in light of the record as a whole."

Deference to an ALJ's credibility analysis is appropriate where, as here, the ALJ explicitly discredits the claimant and gives good reason for doing so. *See Hogan*, 239 F.3d at 962. "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards*, 314 F.3d at 966.

WHEREFORE, for the reasons stated herein, the Commissioner's decision is affirmed.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: July 25, 2005